**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TAMARA L. LESTER,                                    Case No. 1:14-cv-944

        Plaintiff,                                    Beckwith, J.
                                                     Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Tamara L. Lester filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents three claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

**I. Summary of Administrative Record**

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on June 1, 2010, alleging a disability onset date of January 1, 2004 based upon "intractable migraines, pituitary tumor, neuropathy, gastric bypass." (Tr. 76). She also alleged depression. (Tr. 78). Plaintiff's application was denied initially and upon reconsideration, and she timely requested an evidentiary hearing. In May 2013, Administrative Law Judge ("ALJ") Deborah Smith held a hearing, at which Plaintiff was

1

represented by counsel.  Both Plaintiff and a vocational expert testified.  On July 3, 2013, ALJ Smith issued a written decision, concluding that Plaintiff was not disabled. (Tr. 14-25).  The Appeals Council denied review; therefore, the ALJ's decision remains as the final decision of the Commissioner.  Plaintiff filed the instant complaint in order to challenge the ALJ's decision.

Plaintiff was 44 years old on the date she was last insured for purposes of DIB. She has a high school education, and past relevant work as a craft store manager, having owned and operated her own craft store from 2000 through December of 2008. (Tr. 16).  Because the store earned little profit and she did not file regular tax returns to report her earnings to the IRS, there is no evidence that her earnings met the typical earnings threshold contained in the definition of substantial gainful activity ("SGA"), beginning in 2004.  (Tr. 16).  However, based on the fact that Plaintiff reported working fifty to seventy hours a week, as well as the fact that she did not report all of her earnings, the ALJ determined that "her activity/output appeared comparable to substantial gainful activity" until April 1, 2007.  (*Id.,* emphasis added).  Given her reported earnings record, Plaintiff's insured status for DIB expired on December 31, 2007.  Prior to owning and operating the craft store, Plaintiff had relevant work as a nail technician, and paper delivery person.  (Tr. 23).

Little medical evidence relates to any impairment dating from Plaintiff's alleged onset date of January 1, 2004 through August of 2005.  In August of 2005, Plaintiff underwent elective gastric bypass surgery.  Plaintiff's weight decreased from 239 pounds on her alleged onset date to 116 pounds by July of 2007, shortly before her

date last insured ("DLI").[1]  However, Plaintiff suffered from post-surgical complications after her surgery.

The ALJ found that prior to December 31, 2007, Plaintiff had severe impairments of "gastrointestinal problems; obesity; and migraine headaches," but determined that none of those impairments, alone or in combination, met or equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff was entitled to a presumption of disability.  (Tr. 17-18).  Rather, the ALJ concluded that Plaintiff retained the following residual functional capacity ("RFC") to perform a range of light work, except as further limited:

> [T]he claimant could frequently balance; occasionally climb ramps or stairs, stoop, kneel, and crouch; and never climb ladders, ropes, or scaffolds. Additionally, the claimant should avoid concentrated exposure to noise and even moderate exposure to hazards, such as machinery and heights.

(Tr. 19).

Based on the testimony of the vocational expert, the ALJ determined that Plaintiff was fully capable of performing her past relevant work as a craft store manager, nail technician, and/or paper delivery person. (Tr. 23).  Alternatively, the ALJ determined based on VE testimony that Plaintiff could have performed the requirements of a wide range of sedentary occupations including folder/stacker or assembler.  (Tr. 24).  Based upon those determinations, the ALJ further concluded that Plaintiff is not under a disability.  (Tr. 25).

In her Statement of Errors, Plaintiff argues that the ALJ erred: (1) by failing to address several impairments including back pain and borderline hypertension; (2) by

---

[1]Because Plaintiff was insured for purposes of DIB only through December 31, 2007, she must prove that she became disabled prior to that date.  As Plaintiff acknowledges in a footnote, much of the medical evidence of record is irrelevant to the extent that it concerns alleged limitations that post-date her DLI.

3

offering a "skewed and inaccurate" interpretation of the record; (3) by holding that Plaintiff had engaged in SGA through April 1, 2007.  The undersigned finds no reversible error.

## II.  Analysis

### A.  Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability."  *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference

4

from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job.  42 U.S.C. § 423(d)(1)(A).  The relevant time period in this case is January 1, 2004 through December 31, 2007.

### B. Specific Errors

### 1. Consideration of Both Non-Severe and Severe Impairments

Plaintiff first argues that the ALJ erred by failing to fully consider the impact of Plaintiff's non-severe impairments together with her severe impairments. Specifically, Plaintiff contends that despite identifying Plaintiff's affective disorder as a "non-severe" impairment, the ALJ failed to discuss additional impairments including her low back pain with history of laminectomy and LP shunt placement, and evidence of scar tissue around the left S1 nerve root, and borderline hypertension. In addition, Plaintiff briefly claims that the ALJ failed to adequately address her shortness of breath (reported on three occasions in 2005, as well as September 2006) and sleep apnea.

Plaintiff asserts that since the ALJ did not mention back pain or hypertension, the ALJ committed reversible error because there is no way to determine whether the ALJ considered the impairments in calculating Plaintiff's RFC.

The undersigned finds any error to have been harmless. Although the record reflects a history of back pain and related surgery (shunt placement and discectomy) in the late 1990's, many years prior to Plaintiff's alleged disability onset date, Plaintiff fails to show that back pain impacted her work-related functioning in any way during the alleged disability period. The record reflects no such limitation. In June of 2005, in a review of systems during a surgical consult for gastric bypass surgery, Plaintiff complained of nonspecific pain in her low back and joints relating to her obesity (Tr. 423). In November 2005, while seeking treatment on an unrelated issue, she reported a history of nonspecific low back pain. (Tr. 475). In October 2006 she complained of nonspecific upper back pain. (Tr. 1549). In April 2007, Plaintiff again reported

nonspecific low back pain that had been ongoing for two months (Tr. 734), and in May 2007, imaging studies related to that complaint showed mild stenosis and scar tissue around the S1 nerve root. (Tr. 729). By the time of the imaging study, Plaintiff reported "feeling somewhat better with the medications." (Tr. 729). Therefore, she was advised "conservative" follow-up. (*Id.*). Curiously, on at least some occasions she denied any history of back pain. (*See e.g.*, Tr. 728).

Despite modest evidence of sporadic complaints, no physician ever opined or suggested that Plaintiff's back pain significantly affected her functioning. Because the reported back pain never lasted for at least 12 continuous months, it was not severe. *See* 20 C.F.R. §404.1520(c)(defining an impairment as severe if it is medically determinable and significantly limits a claimant's ability to do basic work activities for 12 continuous months). More importantly, whether severe or non-severe, Plaintiff has failed to offer any proof that her alleged back pain, shortness of breath, sleep apnea, or borderline hypertension precluded, for at least 12 continuous months, the light work, various postures, and restricted environments described in the RFC.

### 2. Whether the ALJ Interpreted Evidence in a "Skewed And Inaccurate" Manner

In her second assertion of error, Plaintiff argues that the ALJ's interpretation of the evidence was "skewed and inaccurate…particularly…with respect to Plaintiff's headaches, her chronic abdominal pain with history of numerous abdominal surgeries in 2005, and her depression." (Doc. 9 at 8).

### a. Shortness of Breath and/or Sleep Apnea, Depression

Although she relies chiefly upon evidence of her gastrointestinal issues and headaches, Plaintiff also criticizes the ALJ for allegedly failing to acknowledge that her

7

obesity "created shortness of breath with activity and …sleep apnea," both of which "created additional functional limitations."  (Doc. 9 at 8).   However, Plaintiff never identifies precisely what functional limitations were created by the sleep apnea and/or shortness of breath, the latter of which was reported only with activity or exertion. Moreover, the cause of the referenced non-severe impairments – Plaintiff's obesity – was adequately discussed by the ALJ.  As the ALJ pointed out, Plaintiff's 2005 gastric bypass surgery was successful in resolving Plaintiff's obesity.  By July 2007, a few months prior to the expiration of her insured status, Plaintiff's weight had dropped to 116 pounds, well below obesity standards.  Therefore, the undersigned finds no error in the ALJ's failure to explicitly list and discuss either shortness of breath or sleep apnea among Plaintiff's non-severe impairments.

Similarly, although Plaintiff briefly asserts that the ALJ failed to adequately discuss her depression, she fails to identify record evidence of any limitations relating to that impairment prior to her DLI.  The ALJ discussed Plaintiff's "affective disorder" and explained the reasons for finding that impairment to be non-severe.  In June of 2005, Plaintiff underwent a psychological evaluation prior to her bariatric surgery, at which time her mental status appeared well within normal limits and she was assigned a GAF score of 75.  (Tr. 18).  The undersigned's review of the record confirms that issues relating to depression primarily occurred after Plaintiff's DLI.  Therefore, I also find no error in the ALJ's failure to consider Plaintiff's affective disorder to be severe during the relevant period.

### b.  Gastrointestinal Issues

Plaintiff contends that the ALJ misconstrued the record when she stated that Plaintiff had undergone only "conservative treatment" for her gastrointestinal post-surgical pain, because in addition to her original gastric bypass, Plaintiff underwent additional procedures in 2005 and 2006, during which physicians found and removed at least one staple, surgical glue, and abdominal adhesions caused by the original surgery.  Plaintiff argues that the ALJ failed to discuss the length and breadth of treatment.  Plaintiff states that those additional surgical procedures and recovery time demonstrate that she was unable to maintain acceptable standards of attendance and consequently, unable to sustain competitive work.  In a footnote, Plaintiff concedes that "the evidence is perhaps less certain regarding disability during the period after the foreign bodies were removed from her abdomen…."  (Doc. 9 at 9, n.4).  However, Plaintiff asserts that she remained continuously disabled because her headaches increased in frequency close to the same time.

There is no dispute that Plaintiff experienced unexplained pain soon after her August 2005 gastric bypass surgery. To diagnose and address that complication, Plaintiff underwent two back-to-back exploratory laparoscopies within two weeks of the original surgery, on September 9 and September 12, 2005.  The laparoscopies found evidence of small/ "tiny" area(s) of infection which were treated.  (Tr. 540-45).  A staple and small amount of surgical glue also appear to have been removed as potential causes of infection, with records suggesting that was incidental to treatment of the infection.  (*Id.*).  A later note stated that Plaintiff "did well" after her September 2005 laparoscopies, that diagnostic studies revealed no significant abnormalities, and that

Plaintiff denied diarrhea, nausea, or vomiting despite her complaints of pain. (Tr. 22). She underwent an EGD test in October 2005 that was "normal," as was a CT scan. (Tr. 356, 364). A December 8, 2005 note states that because she continued to complain of left quadrant pain, she was "offered…work up and admission a few weeks ago but she said the Thanksgiving season is her busy season at work and she elected to continue on her job and now came to the office with similar complaints." (Tr. 364). Her pain was described as "somewhat positional in nature, not related to meals." (*Id.*). After another "unremarkable" EGD scope, and noting all other tests had been normal, her physician hypothesized that the pain could be due to adhesions from the original gastric bypass.

Thus, the next day, on December 9, 2005, Plaintiff underwent a third exploratory laparoscopy during which her physician found the adhesions that were suspected to be causing pain, which were then "taken down," "separated" and "freed up" with minimal blood loss and no sign of infection. (Tr. 357).

Although Plaintiff's complaints largely subsided after that point, she complained of sporadic symptoms in August of 2006 and again in late 2007. (*See, e.g.* Tr. 586-588, August 2006 complaint of abdominal pain). Defendant argues that evidence that she was "too busy working" in November 2005 to undergo treatment proves that her pain was not disabling and indeed, posed no functional limitations. Additionally, Defendant calls into question whether Plaintiff's gastrointestinal issues existed for a continuous 12-month period since her complaints largely resolved after adhesions were removed during her third laparoscopic procedure on December 9, 2005. However, Plaintiff argues that her abdominal pain lasted continuously beginning in August 2005 through recovery from a fourth and final laparoscopic surgery in August 2008.

10

Late in 2007, Plaintiff reported additional pain, and in August 2008, she underwent a fourth exploratory laparotomy to investigate that pain. (Tr. 613-614). The 2008 procedure was a "closed" surgery, and occurred well after her December 31, 2007 DLI. Apart from the reported pain that led to that procedure, a note from August 2008 stated that over the "last several years," the original postoperative complications from the August 2005 surgery had "healed well." (Tr. 613).

Having thoroughly reviewed the entirety of Plaintiff's medical records, the undersigned concludes that the ALJ's findings - that Plaintiff's gastrointestinal issues were a severe impairment but not disabling - was reasonable. The ALJ described Plaintiff's impairment as follows: "In August of 2005, the claimant underwent elective gastric bypass surgery…. Post-operatively, the claimant sought occasional treatment for abdominal pain, but all laboratory and diagnostic findings appeared within normal limits." (Tr. 17).

The ALJ's recitation of the evidence contains no error and is repeated in full for the convenience of any reviewing court. In evaluating Plaintiff's pain complaints, the ALJ wrote:

> The claimant's allegation of unremitting impairment related pain that effectively precluded all exertional activity simply is not supported by the evidence of record. Most notably, the claimant alleged an onset date of January 1, 2004; yet, she also owned and operated a gift shop until 2008 (reportedly with help from her family). See Exhibit 1E. There, the claimant acknowledged working long hours where she earned a living. *Id.* Despite the claimant's substantial gainful activity, it appears she rarely filed tax returns on her self-employment earnings…, which diminishes her credibility….
>
> Whatever the claimant's earnings, the records shows … that the claimant said she worked long hours from her alleged onset date until April of 2007 (at the hearing she alleged receiving help as of 2004, which is inconsistent with the information in the record showing this significant help began in

11

2007). As discussed elsewhere, the claimant reported working fifty to seventy hours per week until the spring of 2007….In June of 2005, the record refers to a "busy" and "demanding" lifestyle. … During this time, the claimant indicated that her husband and sons provided only ten to fifteen hours of help per week until 2007. See Exhibit 1E/p2.

\*\*\*

…[A]lthough she alleged on onset date of January 1, 2004, the first medical evidence of record is from the summer of 2005. (See Exhibit 1F/p139). At that time, the claimant underwent pre-op examinations prior to laparoscopic gastric bypass. *Id.* …[T]he claimant's clinical examination appeared normal and she was cleared for surgery….

…Subsequently, in September of 2005, the claimant presented to Georgetown Community Hospital with alleged epigastric and left upper quadrant pain… During her hospitalization, the claimant's condition improved…At the time of discharge, the claimant offered no complaints and ambulated normally…. All laboratory findings appeared within normal limits and clinical examination yielded benign results.

Apparently, the claimant continued to experience occasional complications from surgery….Still, she declined treatment because she described being busy at work during the holiday season. …

In December of 2005, the claimant complained of nonspecific discomfort in the left abdomen, but an EGD revealed no abnormalities…[and] a CT scan…showed no evidence of obstruction or extravasation….

Thereafter, the record reflects a complete absence of treatment until August of 2006 when the claimant sought care for an alleged reoccurrence of abdominal pain. …Nonetheless, the claimant denied any diarrhea, nausea, or vomiting, and she had been able to lose a significant amount of weight since her surgery one year prior. …[R]epeat diagnostic studies indicated no significant abnormalities….

The only other treatment prior to the claimant's last insured occurred in July of 2007….At that time, aside from "abdominal pain attacks that she gets every now and then", the claimant was "doing very well overall"….[A]ll follow-up diagnostic imaging remained within normal limits.

In that regard, the credibility of the claimant's allegations is also reduced by a generally conservative treatment history. Other than gastric bypass surgery, the claimant sought only periodic treatment and did not require frequent emergency treatment, surgical intervention, or any other aggressive management of her impairments. Primarily, the record shows that the claimant's conditions were treated with prescription medications. Also, there were no complaints of side effects from medication….

> Although the claimant might have experienced periodic exacerbations of symptoms,…the claimant actually owned and operated a small business where she admittedly worked between fifty and seventy hours per week. It seems unreasonable to allege[] disabling limitations while at the same time working long, demanding hours without accommodation.

(Tr. 21-22).

Plaintiff is highly critical of the ALJ's reference to her post-operative treatment as "conservative" since it involved numerous surgical exploratory procedures and some invasive tests, including endoscopies and laparoscopies. While this Court may not have used the same adjective to describe Plaintiff's immediate post-operative treatment in 2005, the undersigned finds no reversible error, considering Plaintiff's four-month period of more intensive post-operative treatment was "temporary and effective." (Doc. 13 at 6).

In her reply, Plaintiff reiterates her argument that her treatment history shows a "continuous timeline [of abdominal pain complaints] from the original gastric bypass surgery in August 2005, followed by three more surgeries through December 2005…, followed then by a brief period of time in early 2006 when Plaintiff recovered from those surgeries and realized that her abdominal pain could not be attributed to recovery from surgery" after which she sought more treatment in August 2006, and her pain "continued through 2007 and into 2008" until her final laparoscopy in August 208. (Doc. 14 at 6-7). Plaintiff further argues that records confirm that her pain was "affecting her quality of life." However, none of the records upon which Plaintiff relies, in context of the record as a whole, show reversible error in the ALJ's interpretation of the evidence. For example, the August 2008 record in which Plaintiff decided to undergo a fourth exploratory laparoscopy in an attempt to find an anatomical cause of her nonspecific

13

pain refers to her having discussed the same exploratory surgical options "approximately a year ago." (Tr. 609). In view of other evidence including but not limited to the fact that Plaintiff continued working through 2007, that same record can be viewed as supporting the ALJ's interpretation that Plaintiff's 2007 abdominal pain was not so severe prior to her DLI that she chose to pursue surgery. Records from August 2006 confirm she declined surgery for her intermittent pain at that time. (Tr. 624; *see also* Tr. 620, July 2007 record referring to intermittent but "violent" pain that "she gets every now and then."). Substantial evidence, including that relating to the ALJ's adverse credibility determination, supports the Commissioner's interpretation that Plaintiff's gastrointestinal complaints were not disabling.

### c. Headaches

Plaintiff argues that she has a long history of very frequent headaches, and asserts her headaches increased to almost daily in late 2007. She claims that the medical evidence shows the causes of her headaches were multi-factorial, including stress, migraines, cerebrospinal fluid pressure headaches, and sinus pain, among others. Eventually, she was found to have a pituitary tumor, which was considered a cause of some of her later headaches, though Plaintiff concedes that the tumor did "not necessarily" cause *any* headaches within the relevant disability period. Records confirm that Plaintiff's headaches due to tumor did not increase until 2009, well after her DLI. (Tr. 722-725).

As with Plaintiff's gastrointestinal complaints, the ALJ accurately reviewed and summarized all evidence relating to headaches prior to Plaintiff's DLI. "Although the claimant testified that she experienced three to four headaches a week beginning in

2004, during her examination, she made no particular complaint of headaches at this frequency.… Further, the claimant's clinical examination appeared normal and she was cleared for surgery." (Tr. 21). In November 2005, at the time Plaintiff declined surgery for her abdominal complaints, she "again made no complaint of headaches, let alone at the severity alleged in connection with her application." (Tr. 22). The ALJ pointed out the "complete absence of treatment" from December of 2005 until August of 2006, when Plaintiff returned for treatment for a reoccurrence of abdominal pain, not headache. At the time, a "'review of systems' continued to yield no complaints of headaches." (Tr. 22).

The ALJ further noted that by April of 2007,

> the claimant reported no headaches for approximately three years and that she did not even require prescribed medication any longer…. The latter acknowledgement directly contradicts the claimant's testimony that she tried medication during this time with no effective result. Not only does the lack of treatment for headaches reduce the credibility of the claimant's allegations, so too do the inconsistent statements regarding her treatment.

(Tr. 22, citing 734 "She has had no headaches for about three years, and in fact, is not even on Topamax for migraines.").

Even though Plaintiff testified that she used medication to treat her headaches up to four times a week consistently since 2004 (Tr. 52-53), the ALJ reasonably reached a contrary conclusion based upon Plaintiff's report to her treating physician in April 2007 that she took no medication for headaches and had not suffered from them for about three years. In her reply memorandum, Plaintiff argues that the record on which the ALJ relied *could* have been interpreted as limited in scope to a particular kind of headache - those attributable to her history of pseudotumor ceribri, for which she had

15

an LP shunt placed back in 1999.  (Doc. 14 at 4, n.3).  Plaintiff hypothesizes that the record does not "rule out the possibility that Plaintiff was taking other medication, including over-the-counter medications, for other types of headaches during" the relevant disability period.  Plaintiff's post-hoc rationale notwithstanding, Plaintiff fails to cite to any medical evidence of any reports of continuous headaches or required medication for the same during the relevant disability period.

In fact, the specific records cited by Plaintiff reveal no evidence of any <u>disabling</u> headaches during the relevant insured time period.  Her recitation to the record includes just two complaints of headaches – one in March 2007 and a second in December 2007, between her alleged onset date in January 2005 and her date last insured.  Neither of the two records suggests that her headaches impacted her functioning in any significant way for any significant period of time.  Therefore, the ALJ's analysis of the evidence, including the conclusion that the headaches were not disabling, is easily supported by substantial evidence.

### 3. The ALJ's Alleged Error Regarding Plaintiff's SGA

Plaintiff's third claim of error indirectly challenges the ALJ's adverse credibility determination.  She argues that the ALJ improperly focused on "supposed" inconsistencies regarding how many hours Plaintiff worked per week from 2004-2007, and unfairly "faulted Plaintiff for not filing taxes during certain years, and…for potentially under-reporting the earnings of her business."  (Doc. 9 at 10).  Plaintiff asserts that "there is no real reason to believe" that she underreported her earnings.  According to Plaintiff, she "believed that during those years when her business earned no profit at all there was little reason to file a tax return."  (*Id.*).

Regardless of Plaintiff's "belief" concerning whether she was required to file tax returns, she presents no evidence that her allegedly poor profits eliminated her responsibility to file returns. While she now argues that the ALJ should not have considered her "innocent belief (even if potentially incorrect) that she did not need to file tax returns" for certain years, Plaintiff cites no authority for that proposition, and the undersigned has found none. To the contrary, the ALJ's consideration of Plaintiff's deficient tax returns as one of multiple factors leading to an adverse credibility determination was reasonable.

Plaintiff claims that the ALJ made a factual error by finding inconsistencies. In this appeal, she argues that her sons each worked 20-25 hours per week at her shop beginning in 2007, while her husband worked 10 hours per week. (Tr. 203-204). Plaintiff states that she cut back her hours beginning sometime in 2004, and her two sons and husband each helped 10-15 hours per week. Plaintiff concedes that she testified to the contrary – that she was working 50-70 hours per week until Spring 2007 when her sons began working more (Tr. 203), but she argues that "when taken in context….it becomes clear that the total number of man-work hours required to run the business was at least 50-70 per week, and that Plaintiff was never performing all of those man-work hours by herself." (Doc. 9 at 11). In other words, Plaintiff creatively argues now that her prior statements should somehow have been interpreted in a manner that is "consistent with the affidavit Plaintiff signed in April 2013" that her attorney submitted to the ALJ. In that affidavit, Plaintiff claimed that she worked only 20-35 hours a week beginning in 2004, and that she decreased her hours to just 0-4 hours per week by "Spring 2007" due to her "disabling headaches." (Tr. 280). Plaintiff

17

argues that the ALJ's alternative interpretation and finding of inconsistencies led to an inaccurate factual conclusion regarding Plaintiff's activity level, and requires remand for reconsideration of Plaintiff's credibility and RFC.

The undersigned disagrees, finding the ALJ's interpretation of the evidence to be the most natural interpretation of that evidence, and both reasonable and well-supported by substantial evidence in the record.

The ALJ explained her rejection of the same argument:

> [T]he claimant's representative argued that the Administration "misunderstood" the claimant's explanation of hours she worked.  See Exhibit 15E/p1.  In making the argument, she alleged that the "total number of hours needed to operate the store was 50-70 hours."  Id.  With help from her family, the claimant's representative argued that the claimant actually worked only twenty to thirty-five hours per week beginning in 2004.  Id.  This contention is patently inconsistent with the claimant's own admission that **she** worked fifty to seventy hours a week until the spring of 2007.  See Exhibit 1E/p1.  At no time prior to reaching the hearing level, did the claimant ever allege that she worked fewer hours.  In fact at a June 8, 2005 pre-surgical psychological evaluation, the source refers to a busy and demanding lifestyle from her alleged onset date going forward.  Yet, despite the abundance of evidence otherwise, the claimant testified that she worked only twenty to thirty-five hours per week beginning in 2004.  Certainly the claimant's minimization and inconsistent statements about her work history significantly erodes her credibility.

(Tr. 21, emphasis original).

An ALJ's credibility findings are entitled to substantial deference.  Inconsistent testimony or contrary medical evidence are appropriate reasons for an ALJ to discredit a claimant's account of her limitations.  In this case, the lack of medical evidence in support of Plaintiff's allegedly disabling headaches, along with the above analysis, offer more than sufficient reasons to support the ALJ's adverse credibility findings.  Plaintiff offers no evidence to challenge other inconsistencies, such as her allegation that she

became disabled in January 2005 notwithstanding the lack of any medical treatment from January 2004 until the middle of 2005.

Plaintiff's alternative interpretation notwithstanding, the ALJ's findings were well within the "zone of choice." Plaintiff made multiple statements consistent with the ALJ's interpretation. (*See* Tr. 431, noting psychologist's record of Plaintiff's report of a "busy" and "demanding" lifestyle; Tr. 212, disability report admitting that Plaintiff worked 60 hours per week until December 2008; Tr. 727, stating that she worked until December 2008).

In her reply memorandum, Plaintiff complains that her disability report was completed by an agency employee, D. Cutshall. Plaintiff argues that she "did not get a chance to review" her recorded answers before the form was added to the administrative record. (Doc. 14 at 2). She argues that the signature on the form, D. Cutshall, proves that she did not personally complete it and therefore the answers "were not worded by Plaintiff herself." (*Id.*). She asserts that her subsequent testimony and affidavit are "the more direct evidence" and "better explain the situation." (*Id.*).

However, it was not error for the ALJ to consider Plaintiff's prior statements as the more reliable. Disability forms are typically completed by agency personnel who record the claimant's responses.[2] Plaintiff's recorded response belies Plaintiff's more recent explanation:

> I closed the business 12/2008 due to my condition and the economy. At the end of 2007, I began reducing my hours. My two sons were helping me more in 2007 by working 20-25 hours per week each because I was unable to do what I used to do because of my condition. I was working

---

[2]The disability report reflects that the interview was completed through "Teleclaim with Claimant." (Tr. 208).

50-70 hours a week until spring of 2007, and my sons began working more.

(Tr. 203).  Plaintiff further reported that <u>after</u> she became ill, she continued to make management decisions because "I was still in charge of inventory …and managing the store."  (Tr. 204).  She stated:  "I couldn't be at the store or I was in too much pain or ill because of my conditions.  My husband helped about 10 hours a week and my sons about 20-25 hours a week *beginning in 2007*.  Prior to that they helped about 10-15 hours a week beginning in 2004."  (*Id.*, emphasis added).  The same section of the form inconsistently reports that her husband and two sons provided "20-25 hours a week" of time in assisting her.  (Tr. 204).

In addition to the referenced inconsistent statements, on a form dated June 8, 2011, Plaintiff wrote in what is assumed to be her own handwriting:

> Also I worked the entire year of 2008.  I had my own business we worked until December 18, 2008.  **Your records keep saying I didn't work in 2008, that I needed to be not able to work at the end of 2007.  My headaches became unmanageable in 2008, but [I] continued to work until December 18, 2008.**

(Tr. 274, emphasis added).

Plaintiff's representative attempts to nuance her prior reports by suggesting that in one of the forms, Plaintiff was completing a job history table, and because she ran her craft store business from 2000 through 2008, when she reported that she worked ten hours per day, six days per week, she "obviously wrote down the amount of hours she originally worked," (Doc. 14 at 3), because the form lacked space for her to explain how her hours changed over time.

However, as noted, there are multiple inconsistencies in Plaintiff's prior reports and the medical records.  Plaintiff's initial disability application strongly implies that her

health declined in 2008 – a date that falls after her DLI.  (*See e.g.*, Tr. 235, reporting in August 2010 that she hasn't done candle-making for two years, and has reduced her craft-making activities to once every 14 days, in contrast to her prior crafting "every day - sometimes all day."; *see also* Tr. 255, 9/30/**2010** record describing "constant headache" for "last 2 years.").  Plaintiff's daily activities in 2010 included laundry, dishes, cleaning and preparation of simple meals, and watching TV "all the time."  (Tr. 233-235, 244).  Her 2010 application focuses on balance issues and myriad health complaints, including a worsening of her mood disorder, for which no evidence appears prior to her DLI.  (*See, e.g.*, Tr. 238, reporting that she used to begin decorating the house for Christmas in October, but did not do so in 2009; Tr. 254, describing worsening symptoms since September 2010).

Returning to the relevant period of claimed disability, while Plaintiff argues that the psychologist's reference to her "busy and demanding lifestyle" *could* have referred to non-work activities, (Tr. 430-431), Plaintiff offers no alternative hypothesis even in this appeal.  (Doc. 14 at 4).  In short, notwithstanding Plaintiff's strenuous and somewhat strained arguments to the contrary, the ALJ's conclusions are strongly supported and eminently reasonable.  In particular, substantial evidence exists to support the conclusion that Plaintiff worked more than full time hours from January 2004 until April 2007.

### III.  Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**, and that this case be **CLOSED.**

_/s Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TAMARA L. LESTER,                                          Case No. 1:14-cv-944

           Plaintiff,                                      Beckwith, J.
                                                          Bowman, M.J.
    v.


COMMISSIONER OF SOCIAL SECURITY,

                 Defendant.


**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).